HOWARD T. CHANG, AAL, ALC
HOWARD T. CHANG #1695-0
Suite 475 Pauahi Tower
1003 Bishop Street
Honolulu, Hawaii 96813
Telephone No. (808) 533-2877
E-Mail:
howardchang.crimtaxatty
      @hawaiiantel.net

Attorney for Defendant
ANDY S.S. YIP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ANDY S.S. YIP, (01) ) <br> BRENDA M.O. CHUNG (02) ) <br> ) <br> Defendants. ) <br> ) | CR. NO. CR02-00225 DAE <br><br> DEFENDANT YIP'S RESPONSE TO GOVERNMENT'S SUPPLEMENTARY OPPOSITION TO MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT AS TO COUNT 1 <br><br> DATE: NOVEMBER 13, 2007 <br> TIME: 9:00 A.M. <br> JUDGE: DAVID A. EZRA <br><br> TRIAL AUGUST 15, 2007 |

DEFENDANT YIP'S RESPONSE TO GOVERNMENT'S
SUPPLEMENTARY OPPOSITION TO MOTION FOR
JUDGMENT NOTWITHSTANDING VERDICT AS TO COUNT 1

THE Government in it Supplementary Opposition does not contend that the rule of consistency enunciated by the Supreme Court in **Morrison v. California**, 291 U.S. 82,93 (1934); **Hartzel v. United States**, 322 U.S. 680,682 n.3 (1944); **United States v. Rogers**, 340 U.S. 367,375 (1951) and by the Ninth Circuit in **Lubin**

(CERTIFICATE OF SERVICE ATTACHED)

**v. United States,** 313 F.2d 419, 423 (9th Cir. 1963) is no longer valid.  Nor, could such an argument be raised considering that the rule of consistency is still good law and was not overruled by **United States v. Powell,** 469 U.S. 57 (1984).  **Getsy v. Mitchell,** 456 F.3d 575 (6th Cir. 2006).  In **Getsy**, the Sixth Circuit held that inasmuch as **Powell** did not overrule **Morrison** and **Hartzel** "the rule of consistency is applicable where, as in the instant case, a jury convicts only one of multiple defendants charged with committing the crime of murder for hire.  Murder for hire requires at least two participants:  the hiring party and the person hired."  **Id.** The offense of conspiracy to defraud likewise requires at least two participants.

Instead, the Government argues that the rule of consistency does not apply to Mr. Yip's conviction for Count I because there was offered at trial proof beyond a reasonable doubt of the existence of a conspiracy between Eriko Dmitrovsky, the Government's chief witness at trial, and Mr. Yip, based upon the Ninth Circuit's decisions in **United States v. Wright,** 742 F.2d 1215, 1224 (9th Cir. 1984) and **United States v. Valles-Valencia,** 811 F.2d 1232, 1239 (9th Cir. 1987), modified 823 F.2d 381 (1987).  Under the modified decision in **Valles-Valencia,** the rule of consistency was reconsidered by the Ninth Circuit so that "[E]ach case must be examined carefully to see whether evidence of conspiring with others known or unknown was produced during the trial."

According to the Government, the Dmitrovsky-Yip conspiracy (an uncharged conspiracy) was formed at a July 1998 meeting at the Halekulani Hotel in which Ms. Chung, Mr. Yip, Ms. Dmitrovsky and an unknown gentlemen were present. The Government claims that it was at this meeting that Ms. Dmitrovsky agreed with Mr. Yip to collectively impede, impair, obstruct and defeat the Internal Revenue Service from its lawful functions of ascertaining, computing, assessing and collection federal income taxes, namely from auditing Mr. Yip's 1995 and 1996 income tax returns.

In its Supplementary Opposition, government counsel claims "there can be no doubt that a conspiracy between Yip and Dmitrovsky was formed at the Halekulani meeting in July 1998". Yet, Ms. Dmitrovsky's direct and cross-examination, as shown below, totally refute that conclusion. On direct examination and in response to Assistant U.S. Attorney Osborne's questioning, Ms. Dmitrovsky testified that Brenda asked her to write a letter to the IRS regarding a loan by Ms. Dmitrovsky to Mr. Yip; that Brenda told her what to write in the letter; that she and Brenda agreed upon the loan amount; that Brenda told her not to go to an interview with Revenue Agent Liburd and then what to say if she went; that Ms. Dmkitrovsky had never seen five separate promissory notes purportedly issued by Mr. Yip to her for $350,000; and that she could not recognize whether it was Mr. Yip's signature on any of the notes.

On direct examination, in response to Mr. Osborne's questioning, Ms. Dmitrovsky stated:

[p.6:3-19]

```
 3   Q   Now, did there come a time that you were contacted in
 4   regard to a special favor or something you could do?
 5   A   Yes.
 6   Q   And do you remember approximately when that was?
 7   A   That was 1998, if I'm not mistaken, that year.
 8   Q   Okay. And who contacted you?
 9   A   Brenda.
10   Q   And what did she say?
11   A   She said: Andy has a small tax problem. Please write a
12   letter to IRS you loan money to Andy.
13   Q   Okay. And how was this contact made, in person, phone,
14   how?
15   A   I think first time maybe in person, but when I wrote a
16   letter I have to write it down. So, by phone and then I wrote
17   down and I wrote a letter, and I sent to IRS.
18   Q   Okay. Now, did you meet -- well, let's back up just a
19   little bit.
```

[p.8:20-9:22]

```
20   Q   Now, these notes were presented to the IRS in March of
21   1998. Had you discussed these notes with Mr. Yip before that?
22   A   **No.**
23   Q   Did you and the Defendant Chung have any discussions
24   concerning the amount of money she said that you were supposed
25   to have learned -- loaned?

 1   A   Yes.
 2   Q   Okay. And tell us about that. First of all, where did
 3   those discussions take place?
 4   A   Where, I don't quite remember which restaurant or hotel,
 5   but the amount was 500,000.
 6   Q   That was what, what Ms. Chung said she wanted?
 7   A   No, for Andy.
 8   Q   Okay. All right. And you were to say you had loaned
 9   500,000?
10   A   No, I said I cannot.
11   Q   Okay. Was there anybody present during these discussions
12   except you and the Defendant Chung?
13   A   **No.**
14   Q   Okay. Why did you say you couldn't say you had loaned
15   500,000?
16   A   Because it's too much money. And also, she said it's
17   confidential matter, so I cannot ask any of my bank or
18   financial advisers. So I have to decide, but I thought it's
19   too much money, so I said no.
20   Q   Did the two of you ever agree on an amount you were
21   willing to say you had loaned?
22   A   **I said maximum 350,000.**
```

[10:11-12:6]

```
11.  Q   Now let's look at Exhibit 31. You mentioned a letter
         that
12   you were to write the IRS. What's this?
13   A   This is a letter I was asked to write to IRS by Brenda.
14   Q   Okay. And did you send it in?
15   A   I did.
```

```
16            MR. OSBORNE: And we would move Exhibit 31 into
17    evidence.
18            MR. LUKE: I have no objection.
19            THE COURT: Be received.
20    (Government's Exhibit 31 was received in evidence.)
21            MR. OSBORNE: And if we could put that up, please.
22    BY MR. OSBORNE:
23    Q     Why did you send this letter to the IRS?
24    A     Because, again, Brenda was more than my friend, she was
              my
25    sister, like my real sister. And she helped me so much when I

1     was alone, sad. So I just did it.
2     Q     Okay. Did you discuss what was to be in the letter with
3     anybody?
4     A     No.
5     Q     Okay. Where did the amount, the first line up there says
6     total amount: $350,000?
7     A     Yes.
8     Q     Yeah, where did that come from?
9     A     Well, this is the maximum that I thought I could give
              just
10    a letter.
11    Q     Okay. And then it says the years '95 and '96. How did
12    you know that those years were important?
13    A     I just wrote a letter exactly what Brenda told me.
14    Q     And how did Brenda tell you what to put in the letter?
15    A     Exactly the -- the letter I wrote.
16    Q     Okay. But I mean, was she present when you were
17    writing --
18    A     No, by phone.
19    Q     By phone. All right. Who told -- was it Brenda that told
20    you the money was loaned numerous times?
21    A     **Brenda -- I wrote exactly what I was asked**.
22    Q     Okay. Did you ever show this letter to either Brenda or
23    Mr. Yip before you mailed it?
24    A     Maybe I sent a letter by fax. I don't believe that I
25    mailed it to them.

1     Q     But you think you might have faxed?
2     A     I think so, yes.
3     Q     And to who did you fax it?
4     A     **Brenda.**
5     Q     Now, did you ever meet with anyone to discuss this
              letter?
6     A     **No.**
```

[13:1-15:25]

```
1     Q     Okay. How did it come about that there was a meeting
2     regarding the loan, did you call and ask, did --
3     A     No, I was -- no, Brenda called me --
4     Q     Okay.
5     A     -- and we have lunch together.
6     Q     All right. So this is a lunch meeting?
7     A     Yes.
8     Q     Other than saying let's get together for lunch, did
9     Ms. Chung tell you anything about why you were having this
10    meeting?
11    A     Not exactly.
```

```
12   Q      So you arrive at this luncheon meeting and there are
            these
13   three people present?
14   A      Mm-hmm.
15   Q      And what do you talk about at the meeting?
16   A      Well, I wouldn't have any problems, I just have to write
            a
17   letter and then send IRS and then of course I signed, but I
18   wouldn't have problem.
19   Q      I'm sorry, ma'am, I'm --
20   A      I wouldn't have problem by writing and sending a letter
            to
21   IRS.
22   Q      Okay. Did you say you didn't have any problem; is that
            --
23   A      No, Brenda -- well, I mean they said to me I wouldn't
            have
24   problem by writing a letter, sending a letter to IRS.
25   Q      All right. Do you remember which one of them said it

1    would be no problem?
2    A      Brenda definitely and then the gentleman, but I don't
3    remember his name.
4    Q      Okay. Well, that's fine. And then it was after this
5    meeting that you had the telephone calls and you wrote the
6    letter?
7    A      Mm-hmm.
8    Q      All right. After you wrote that letter -- oh, by the
            way,
9    how did you know who to write the letter to, this letter --
     and
10   then we can put it back up, if you would, I'm sorry -- this
11   letter is to a Ms. Emerald Liburd, or Liburd I think she
12   pronounces it. How did you know to write it to this person?
13   A      **Well, whole thing I was told who to write, how to write,**
14   **the wording by Brenda. I never met her, I never knew her.**
15   Q      Okay. But there did come a time when you did have a
16   meeting with Ms. Liburd, didn't you?
17   A      Yes.
18   Q      Okay. How did that happen?
19   A      She contacted me and she said: I have some question to
20   you regarding the letter you sent to me.
21   Q      Mm-hmm. And so did you agree to meet with her?
22   A      Yes, I did.
23   Q      Did you say anything to either of the defendants
24   concerning the meeting you were going to have?
25   A      **Of course I called Brenda.**

1    Q      And what did you say?
2    A      Actually I was leaving country next day. She said: You
3    don't need to go, you are very busy. But I decided to meet
4    her.
5    Q      Okay. So, you went to the meeting?
6    A      Yes.
7    Q      And what happened at that meeting?
8    A      She asked me the question how --
9    Q      Ms. Liburd?
10   A      Yes, Mrs. Liburd.
11   Q      Mm-hmm.
12   A      She asked me the questions: How did you bring all this
13   money to this country? So like the letter, I asked my friends,
14   each one of them, each time $10,000.
```

```
15    Q      Okay. Where -- where had you gotten that idea to say
             your
16    friends --
17    A      I was told by Brenda, $10,000 each friend of mine.
18    Q      Mm-hmm. And when was it that Brenda had said: Say that
19    your friends brought 10,000?
20    A      Each time?
21    Q      Yeah.
22    A      Before I went to the meeting.
23    Q      And then Ms. Liburd challenged you and said that doesn't
24    add up, right?
25    A      Yes.
```

Moreover, on cross-examination, Ms. Dmitrovsky testified that she barely knew Mr. Yip and had never had lunch or dinner or been together alone with him. [TR. 9/5/07 35:21-36:19]

```
21    Q      Let me ask you this: How long have you known Mr. Yip?
22    A      Maybe since 1990 -- after my husband passed away. So
             must
23    be late '94, '95. But I don't remember.
24    Q      Okay. And over the years, at least when you were in
25    Honolulu, you do see him quite often, right?

1     A      Not quite often.
2     Q      Once a month?
3     A      I -- I never saw Mr. Yip just the two of us. With
             Brenda.
4     Q      Never saw Mr. --
5     A      So, I don't remember how often. Sometimes he showed up
6     for lunch or sometimes he showed up for dinner, but I never
7     called him. I never make any appointment with him. So
8     definitely not often.
9     Q      Did you ever have lunch just with you and Mr. Yip
10    together?
11    A      Never.
12    Q      Did you have dinner with Mr. Yip just you and him
13    together?
14    A      Never.
15    Q      Okay. So you never had these -- never had a lunch or
16    dinner with him at the Halekulani Hotel?
17    A      Two? No.
18    Q      Just the two of you?
19    A      No, never.
```

She then reiterated that Mr. Yip had nothing to do with the preparation or contents of her July 1998 letter to Emerald Liburd that she had never seen any of the five promissory notes; and that she could not even recognize Mr. Yip's signature on the notes.

[29:13-14]

```
13   A    No, again, same thing, I didn't speak with Mr. Yip
14        regarding this letter. When I wrote the letter --
```

[tr 9/5 31:4 - 33:4]

```
4    Q    Now, this is a promissory note that's in evidence,
5         Government Exhibit 32D. Says February 1996, 100,000. It's a
6         promissory note payable to you, correct?
7    A    Yes, but I didn't type it, I didn't sign it. I never saw
8         this paper.
9    Q    Okay. Well, isn't it true, Ms. Dmitrovsky, that you
10        testified in the grand jury that you hadn't seen it before the
11        grand jury, but you had seen it at that time?
12   A    Yes, but ---
13   Q    Now, there were some other promissory notes that you
          had;
14        you recall those? Let me -- excuse me, Your Honor.
15             (Pause in the proceedings.)
16        I'd ask you to turn to Exhibit 30, please.
17   A    30.
18   Q    Yes, Government Exhibit 30.
19   A    30.
20   Q    Which is in evidence.
21   A    Yes.
22   Q    You see it."The first promissory note is dated December
23        1995, 50,000?
24   A    Mm-hmm.
25   Q    Yes?

1    A    Yes.
2    Q    Okay.
3    A    But again, it is not typed by me, neither typed by me,
4         neither signed by me.
5    Q    Is it signed by Mr. Yip?
6    A    I don't know. I -- I don't know Mr. Yip's signature.
7    Q    You don't know?
8    A    No.
9    Q    You don't know his signature?
10   A    No.
11   Q    Turn to the next page, August 31, 1995; $50,000
          promissory
12        note?
13   A    No.
14   Q    You don't recognize that either?
15   A    No. Not at all.
16   Q    You don't recognize the signature?
17   A    No.
18   Q    Or the next one, June 30, 1995; 50,000?
19   A    No.
20   Q    You don't recognize that either?
21   A    No.
22   Q    Is it your testimony you never saw this before?
23   A    No.
24   Q    What is your testimony?
25   A    Well, I saw this when I saw the prosecutor, but I never

1         saw this before.
2    Q    All right. Then let me show you the next page, there's
```

```
3    another promissory note dated March 31, 1995, for 100,000?
4    A    No.
```

Any review of Eriko Dmitrovsky's testimony discloses that she does not state that she and Mr. Yip agreed to do anything together or did anything together that might constitute a conspiracy. At most, the Government's trial evidence indicates that Mr. Yip may have been a third party beneficiary. We, however, are aware of no rule of law which makes a third party beneficiary a member of a conspiracy.

Accordingly, the Government clearly failed to establish that Eriko Dmitrovsky agreed with Mr. Yip to enter into a conspiracy to obstruct, impede, impair and defeat the Internal Revenue Service audit of his 1995 and 1996 income tax returns. In absence thereof, the Motion for Judgment Notwithstanding Verdict as to Count 1 should be granted.

DATED:  Honolulu, Hawaii, _____December 3, 2007_____.


_____
HOWARD T. CHANG
Attorney for Defendant
ANDY S.S. YIP

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was duly served on the person(s) named below, in the manner described thereto, at their last known address on __December 3, 2007_____:

|  | U.S. Mail | Hand Deliver |
|---|---|---|
| LESLIE E. OSBORNE, ESQ.<br>Asst. U.S. Attorney<br>6-100 PJKK Federal Building<br>300 Ala Moana Boulevard<br>Honolulu, Hawaii 96850<br><br>Attorney for Plaintiff<br>UNITED STATES OF AMERICA |  | X |
| HOWARD K.K. LUKE, ESQ.<br>841 Bishop Street #2022<br>Honolulu, Hawaii 96813<br><br>Attorney for Defendant<br>BRENDA M.O. CHUNG |  | X |

DATED:  Honolulu, Hawaii, _____December 3, 2007_____.

_____
HOWARD T. CHANG
Attorney for Defendant
ANDY S.S. YIP